IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| ANILA CHINTAGUNTA | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:25-CV-806 |
| | § | |
| JOHN PETER SMITH HOSPITAL, | § | |
| ET AL. | § | |

OBJECTION TO THE AMENDED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS REGARDING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

To the Honorable Judge of the United States Federal District Court, I, Plaintiff Anila Chintagunta, object to some of the findings, conclusions, and recommendations set forth by the United States District Court Magistrate Judge in Document 34.

### A.   Claims Against Duncan and Paxton

I have no objections to the findings, conclusions, and recommendation as stated in Document 34, Section III Legal Analysis, Part A. Claims Against Duncan and Paxton.

## B.    Claims Against JPS

I object to the recommendation that all claims against JPS be dismissed with prejudice for lack of subject-matter jurisdiction as stated in Document 34, Section III Legal Analysis, Part B. Claims Against JPS. JPS's liability would be based on the 14th Amendment section 5 which states: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article", thus overriding sovereign immunity and allowing for subject-matter jurisdiction for a state/local entity in federal court. I have listed the Monell Elements as described in the Document 34:

(1) Official Policies or Widespread Customs at JPS include:

1. Policy or Custom: The Medical Intensive Care Unit (MICU) sends required information to medical students prior to the start of the rotation.

2. Policy or Custom: All MICU affairs are under the chief of critical care Amanda Pientka, regardless of her attendance and observation of me, a medical student.

3. Policy: Visions ("Promote a teaching environment that… encourages academic excellence." from JPS Academic Affairs Website) and Values ("compassion, commitment to interprofessional teamwork, empathy and human connection, empowerment, innovation, professionalism, well-being." from JPS Academic Affairs Website)

4. Widespread Custom: Residents admit feeling stressed because of work and then bully me in their workplace. They also use vague but absolute terms like "you are never here and you don't care." Then the evaluators rely on the residents for updates and narratives.

    5. Widespread Custom: they do not take statements from individuals with dark skin seriously. I witnessed a black male not being taken for an MRI or surgery when he complained.

(2) A policymaker who can be charged with actual or constructive knowledge:

    1. Current resident told me he received the information prior to the start of the rotation from JPS Official Critical Care Chief Amanda **Pientka**. Hospital Administrator Robert Sanchez directed me to Pientka when I reached out to him, but I had not received communication from her and did not know who she was. This consisted of important information including hours/dates/absences since it is different from other rotations and plays a role in the final evaluation.

    2. Chief of Critical Care Amanda Pientka filled out my evaluation form despite observing me for only 15 minutes in the Emergency Department which was *outside* the MICU. I requested Attending Physician Lois who did observe me to fill out my evaluation but he redirected me to **Pientka**. A resident also took my evaluation paper to give to Pientka.

    3. The constant belittling from the residents did not facilitate teamwork, nor promote a teaching environment that encourages academic excellence. Current Residents say they were able to use this rotation to secure a residency spot. The lack of empathy and human connection were the opposite of empowering, professional or beneficial to my well-being. I reported this to **Pientka**, but instead of stopping the residents, she participated in the same behavior.

4. Residents in multiple departments including Psychiatry and MICU were bullies to me. I complained to the Chief of MICU (Pientka) about the residents in her department but she blatantly said, "I don't care" and then said lies about me.

(3) a constitutional violation whose moving force is that policy (or custom)

1. 14th Amendment, Section 1, Equal Protection Clause Violation: Official Action: unlike other students on this rotation, I was not given the syllabus or schedule prior to the start of the rotation.

2. 14th Amendment, Section 1, Equal Protection Clause Violation: Official Action & Imprimatur: My official evaluation consisted of multiple lies including handwritten comments, numerous "below expected" boxes checked despite the written description explaining what it means and performance that would objectively qualify for at least "expected", and number of absence days. This was signed by Amanda **Pientka.** In addition, Pientka commanded me to leave my belongings in the room and then lied to my face in the hallway.

3. 14th Amendment, Section 1, Equal Protection Clause Violation: Official Action: Chief of Critical Care Pientka lied to my face, screamed at me in the hallway and the resident's room, and used large arm motions. She then stood against one wall in the hallway and instructed me to stand on the other wall; every time I moved away from the wall to hear her better, she started circling away from me and over to my previous wall. She lied that I lied about her residents. She also said that "all" the residents "always" complained about me and reiterated everything they said to me including "you are never here," "you don't do anything," "you don't finish your

4

notes." She said that she was not going to look at my notes or provide me feedback for my education.

4. 14th Amendment, Section 1, Equal Protection Clause Violation: Official Action: Pientka's lack of instruction and teaching for me, residents gave other students privacy during their feedback but not me. Residents used their bodies to violate the "empowerment…professionalism," policy.

5. All the Equal Protection Clause Violations show that I did not have a neutral administration/superiors who discriminated against me which are violations of due process and equal protection.

### C.     Claims Against UNTHSC-TCOM

I object to the finding and conclusion that UNTHSC-TCOM is entitled to sovereign immunity. The 14th Amendment section 5 states: "**The Congress** shall have power to enforce, **by appropriate legislation**, the provisions of this article," thus overriding sovereign immunity and allowing for subject-matter jurisdiction for a state/local entity in federal court. I object to the recommendation that all claims against UNTHSC-TCOM be dismissed without prejudice for lack of subject-matter jurisdiction as stated in Document 34, Section III Legal Analysis, Part C. Claims Against UNTHSC-TCOM.

The following are violations of my 14 Amendment Constitutional Rights:

1. Policy: only what they explicitly state applies to students. For example, a student doing cocaine is not under university administrative discipline because she is not "wearing a UNTHSC t-shirt to a bar" – the last part is prohibited and was stated clearly during university orientation. But for me, the description of professionalism in the syllabus and

    the descriptions od each competency on the rotation evaluation was not sufficient. Example: David Mason said it was not enough that I was professional, I needed to "learn and grow" but could not define this in our meeting.

2. Numerous administrators are present in each meeting but failed to state what I did wrong, when I was observed, and when I did it again to show that I never improved or did something deserve of dismissal. In my dismissal meeting, they claimed I had "severe professionalism issues" but could not mention one event that occurred. For example, Ryan Seals claimed I did not do an activity that was required, but formal documents sent from the university show that the activity was NOT required for me.

3. In the final appeal dismissal meeting, the dean brought up failures though I successfully remediated everything.

4. University's policy is to take harassment/assault/sexual assault seriously AND all students are taught to obtain consent before touching patients or classmates. However, UNTHSC-TCOM they made me fill out sexual assault paperwork though I did not complain about that because it was their professor, which took up a lot of my time. And when I did complain about the JPS residents touching me, they called JPS their partners and did not conduct an investigation.

5. Students are generally allowed to finish their exams, but for me a professor finished grading me before I finished.

6. A policy of "we care" and treating humans as a "body, mind, and spirit" as an osteopathic medical school, while choosing to carry out these discriminatory acts against me shows the extent of their understanding and the severity of their choices.

7. Other students get extensions for their boards exams and I was told that some of the other test scores I received were my fault since I did not ask for an extension. But when I asked for an extension for the Boards Exam deadline, I was denied it twice, forcing me to take it. In addition, other administrators like Janice Knebl who also hold positions in the National Board of Osteopathic Medical Education (NBOME) - a thorough discovery may reveal connections with a third party.

8. A widespread policy it to suggest that all students consider family medicine as their backup specialty to make sure they match, but I was told to switch from an ulta competitive half-surgical specialty (Ophthalmology) to a less competitive half-surgical specialty: Ob/Gyn. I was never given a schedule for this rotation and was placed on a 84-hour shift unlike all the other students, though I also paid my tuition.

These main points show that UNTHSC-TCOM violated my equal protection and due process granted to all citizens of the United States, since it was consistently the same group of non-neutral individuals and the meeting were not meaningful where I could be heard. All meetings involved UNTHSC-TCOM dismissing my complaints immediately, claiming they took everything seriously, and even lying.

### D. Claims Against Nash

I have no objections to the recommendation that Nash be dismissed without prejudice. However, I object to the findings that my dismissal was because of "poor academic performance, poor behavior, and failure to successfully perform in remediation opportunities," since the text used in Document 14 (Second Amended Complaint) was Nash's wording to state reasons for my dismissal. I object to the conclusion that Nash is entitled to Sovereign Immunity as stated in Document 34, Section III Legal Analysis, Part D. Claims Against Nash. My claims

against UNTHSC-TCOM involve a violation of the 14th Amendment (Section 5 states "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.") since I was not afforded a meaningful opportunity to discuss my dismissal and many of the reasons stated were violations of the equal protection clause themselves.

I also object to the finding that further amendment to my complaint would be futile (Doc 34, pg 14, Footnote 15.)